**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

**INFINITY HOSPICE CARE LLC**                    Case No.: 3:26-cv-2174

                    **Plaintiff,**

**v.**

**ROBERT F. KENNEDY, JR., in his
official capacity as Secretary of the United
States Department of Health & Human
Services,**

                    **Defendant.**

---

**COMPLAINT FOR JUDICIAL REVIEW OF ADMINISTRATIVE DECISION**

---

Plaintiff Infinity Hospice Care LLC (the "Hospice"), by and through its undersigned counsel, files this Complaint against Defendant Robert F. Kennedy, Jr., in his official capacity as the Secretary of the United States Department of Health and Human Services (the "Secretary"), seeking judicial review of the decision rendered by the Administrative Law Judge ("ALJ") of the Office of Medicare Hearings and Appeals ("OMHA") in OMHA case number 3-14079596260 and in relation to Medicare Appeals Council ("Council") docket number M-26-1689.

## PARTIES

1.      The Hospice is an Arizona Limited Liability Company. The Hospice was acquired by LifeCare Haven Holdings, LLC in November 2025, and, as such, its officers direct, control, and coordinate its activities at its principal place of business located at 5601 Executive Drive, Suite 250, Irving, Texas 75038.

2.      Defendant, Robert F. Kennedy, Jr., is the Secretary of the United States Department of Health and Human Services and the proper defendant in this action pursuant to 42 C.F.R. § 405.1136(d)(1).

## JURISDICTION AND VENUE

3.      This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*. ("Medicare Act"), and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA").

4.      Prior to filing this Complaint, the Hospice filed appeals and received determinations as to all issues presented below.

5.      The Council did not issue a final decision or dismissal order or remand the case to the ALJ within 90 calendar days of receipt of the Hospice's Request for Review. *See* 42 C.F.R. § 405.1100(c). Accordingly, on April 23, 2026, the Hospice properly requested that the appeal be escalated to federal district court as permitted by 42 C.F.R.§ 405.1132(a). On May 1, 2026, the Council issued an order granting the Hospice's request for escalation. The ALJ's decision is the final administrative decision and is appealable to this Court under 42 U.S.C. §1395ff(b) and 42 C.F.R. §§ 405.1132 and 405.1136.

6.      Therefore, because the Hospice has exhausted all administrative appeals and, thus, has no administrative remedy available to it, this Court is the proper forum to hear this Complaint.

7.      As mandated by 42 C.F.R. §§ 405.1132(b) and 405.1136(c)(1), this action has been commenced within 60 days of receipt of the Council's notice dated May 1, 2026, that it is not able to timely issue a final decision, dismissal order, or remand order.

8.      Jurisdiction is proper pursuant to 28 U.S.C. § 1331, which vests federal district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties

of the United States," and 42 U.S.C. § 1395ff(d), which authorizes judicial review of the ALJ's decision.

9.      Venue is proper pursuant to 42 U.S.C. § 1395ff(b) and 42 C.F.R. § 405.1136(b)(1), as the Hospice's principal place of business is located in this judicial district.

10.      The amount in controversy exceeds the threshold amount of $1,960.00 for judicial review set forth in 90 FR 55869 (effective January 1, 2026).

## STATUTORY AND REGULATORY BACKGROUND

### Overview of the Medicare Hospice Benefit

11.      The Medicare Hospice Benefit (the "Benefit") is a benefit under Medicare Part A, a 100% federally subsidized health insurance program. It is administered by the Centers for Medicare and Medicaid Services ("CMS") on behalf of the Department of Health and Human Services ("HHS"). The Benefit pays a predetermined fee, based on the level of care provided by the hospice provider, for each day an eligible individual receives hospice care.

12.      Through the Benefit, Medicare covers reasonable and necessary hospice services provided to eligible individuals. Services available under the Benefit are "comprehensive" and include (a) nursing care and services provided by or under the supervision of a registered nurse, (b) medical social services provided by a qualified social worker under the direction of a physician, (c) physician services, (d) counseling services, including bereavement, dietary, and spiritual counseling, (e) short-term inpatient care, (f) medical supplies, including drugs and biologicals, (g) home health aide / homemaker services, and (h) physical, respiratory, occupational, and speech therapy services. 42 C.F.R. § 418.202; *see also* 42 C.F.R. § 418.3; 42 U.S.C. § 1395x(dd).

13.      To receive the Benefit, an eligible individual or their legal representative must sign an election statement acknowledging that he or she "has been given a full understanding of the

palliative rather than curative nature of hospice care, as it relates to the individual's terminal illness and related conditions." 42 C.F.R. § 418.24. Palliative care is "patient and family-centered care that optimizes quality of life by anticipating, preventing, and treating suffering[;]…addressing physical, intellectual, emotional, social, and spiritual needs[;] and…facilitat[ing] patient autonomy, access to information, and choice." 42 C.F.R. § 418.3. The election statement must also acknowledge that "certain Medicare services" are waived by the election, namely "Medicare services that are related to the treatment of the terminal condition for which hospice care was elected or a related condition," except for services provided by the particular hospice or the individual's designated attending physician. 42 C.F.R. § 418.24; *see also* 42 U.S.C. § 1395y(a)(1)(c) ("[N]o payment may be made…for any expenses incurred for items or services…in the case of hospice care, which are not reasonable and necessary for the palliation or management of terminal illness."). Individuals are free to revoke the election of the Benefit at any time and for any reason. 42 C.F.R. § 418.28.

14.     Hospices are required to provide patients who elect the Benefit everything those patients would normally receive on a fee-for-service basis for palliation of their terminal illnesses and related conditions (*e.g.*, medications, physician visits, durable medical equipment, etc.), *including* things Medicare would have otherwise paid for had they not elected hospice. *See* 142 Cong. Rec. S9582 (daily ed. Aug. 2, 1996) (statement of Sen. Breaux) (Congress has confirmed that, absent hospice care, the government is otherwise required to pay for "whatever palliative services are needed to manage [the patient's] terminal illness.").

15.     The government conditions reimbursement of hospice services on a certification of hospice eligibility. 42 U.S.C. § 1395f. The Benefit is organized around benefit periods, *i.e.*, two 90-day benefit periods followed by an unlimited number of 60-day benefit periods. 42 U.S.C. §

1395d(a)(4). The hospice provider must obtain a written certification that the individual is terminally ill (a "CTI") "at the beginning of [each benefit] period" and "before it submits a claim for payment." 42 U.S.C. § 1395f(a)(7)(A); 42 C.F.R. § 418.22(a)(1)-(2). For the initial 90-day benefit period, a hospice provider must obtain a CTI from (1) the hospice's medical director or a physician in the hospice interdisciplinary group (a "Hospice Physician"), and (2) the individual's designated attending physician (the "Designated Attending") (if any). For all subsequent benefit periods, a CTI need only be obtained from a Hospice Physician. 42 U.S.C. § 1395f(a)(7)(A)(ii); 42 C.F.R. § 418.22(c).

16.    Given the nuances and complexities involved in prognostication, as described below, Congress and CMS have entrusted physicians with the responsibility to determine whether a patient meets the definition of "terminally ill." 42 U.S.C. § 1395f(a)(7); 70 Fed. Reg. 70532, 70539 (Nov. 22, 2005) ("It is the physician's responsibility to assess the patient's medical condition and determine if the patient can be certified as terminally ill."). Stated succinctly, "[i]t would be unfair to expect a hospice to correctly predict how an ALJ would always rule in this uncertain and complicated area based simply on the receipt of non patient-specific material from CMS." *Hospice of E. Tex. v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, No. 5:23cv136-RWS-JBB, 2025 WL 1062504, at \*37 (E.D. Tex. Feb. 21, 2025), *report and recommendation adopted sub nom. Hospice of E. Texas v. Sec'y, United States Dep't of Health & Hum. Servs.*, No. 5:23-CV-136-RWS-JBB, 2025 WL 957519 (E.D. Tex. Mar. 31, 2025). An individual is "terminally ill" when the Designated Attending (if applicable) and a Hospice Physician exercise their clinical judgment to conclude that "the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." 42 U.S.C. § 1395x(dd)(3)(A); 42 C.F.R. § 418.3. A "life expectancy" of 6 months or less means that, in the clinical judgment of the

5

Designated Attending (if applicable) and a Hospice Physician, the individual's clinical status at the time of certification is more likely than not (*i.e.*, a probability of greater than 50%) to result in death within six months based on the normal course of the individual's illness. 42 C.F.R. § 418.3.

17.     Several changes have been made to the Benefit over the years to ensure that Designated Attendings and Hospice Physicians who complete CTIs ("Certifying Physicians") are closely involved in evaluating individuals to predict prognosis and assess eligibility on an ongoing basis. *See, e.g.*, 75 Fed. Reg. 43236 (July 23, 2010). For example, CTIs must now include a "brief narrative explanation of the clinical findings" supporting terminality ("CTI Narrative") and an attestation "confirm[ing] that [the Certifying Physician] composed the narrative based on his/her review of the patient's medical record or, if applicable, his/her examination of the patient." 42 C.F.R. § 418.22(b)(3)(iii). Additionally, CTIs for all 60-day benefit periods must be preceded by a "face-to-face encounter" ("F2F") in which a Hospice Physician or hospice nurse practitioner visits a hospice patient to gather clinical findings for the Hospice Physician's consideration in determining their continued eligibility for hospice care. Certifying Physicians must explain, in the CTI Narrative, why the F2F clinical findings support a life expectancy of 6 months or less. 42 C.F.R. § 418.22(a)(4) and (b)(3)(v).

18.     When Certifying Physicians evaluate an individual's eligibility for hospice, they look at *prognosis*, not diagnosis. 78 Fed. Reg. 48234, 48245 (Aug. 7, 2013). Prognosis takes into account diagnoses and all other things related to an individual's life expectancy. 78 Fed. Reg. 48234, 48245-46; *see also* 79 Fed. Reg. 50452, 50469 (Aug. 22, 2014) ("[T]he individual's whole condition plays a role in that prognosis.... We have recognized throughout the federal regulations at 42 CFR Part 418 that the total person is to be assessed, including acute and chronic conditions, as well as controlled and uncontrolled conditions, in determining an individual's terminal

prognosis."). Thus, Certifying Physicians "must consider the primary terminal condition, related diagnoses, current subjective and objective medical findings, current medication and treatment orders, and information about unrelated conditions when considering the initial certification of the terminal illness." 73 Fed. Reg. 32088, 32138 (June 5, 2008); *see also* 42 C.F.R. § 418.25(b) ("In reaching a decision to certify that the patient is terminally ill, the hospice medical director must consider at least the following information: (1) Diagnosis of the terminal condition of the patient; (2) Other health conditions, whether related or unrelated to the terminal condition; (3) Current clinically relevant information supporting all diagnoses."); 79 Fed. Reg. 50452, 50469 (Aug. 22, 2014).

19.     While a prognosis of six months or less is a necessary condition for reimbursement, Congress has acknowledged that "[p]redicting life expectancy is not an exact science." *See* 142 Cong. Rec. S9582 (daily ed. Aug. 2, 1996) (statement of Sen. Breaux); *see also* 75 Fed. Reg. 70372, 70488 (Nov. 17, 2010). The phrase "if the illness runs its normal course" in the definition of "terminal illness" is an important recognition by CMS that a physician's determination of patient prognosis cannot, and need not, be a certainty. *See* 55 Fed. Reg. 50831, 50832 (Dec. 11, 1990) (citing Government Accounting Office, *Program Provisions and Payments Discourage Hospice Participation* (Sept. 29, 1989)). CMS has also recognized that there will be variability in lengths of stay because "individuals vary in their responses to illness and care," and it is not "feasible or prudent to specify or predetermine what lengths of stay should or must be achieved to measure or evaluate the effectiveness of care provided." *See* 72 Fed. Reg. 50214, 50222 (Aug. 31, 2007). Therefore, "[t]he fact that a beneficiary lives longer than expected in itself is not cause to terminate benefits." Medicare Benefit Policy Manual, CMS Pub. No. 100-02, Ch. 9, § 10.

20.    The current Medicare framework does not preclude reimbursement for periods of hospice care that extend beyond six months. There used to be a 210-day statutory limit on hospice care, but Congress removed that limitation in 1989 in recognition of the uncertainty of prognosis. *See* 42 U.S.C. § 1395d(d)(1) (establishing that hospice providers may collect reimbursement for an unlimited number of benefit periods); *see also* Medicare Catastrophic Coverage Repeal Act of 1989; 70 Fed. Reg. 70532, 70533 (Nov. 22, 2005). CMS has stated:

> Recognizing that prognoses can be uncertain and may change, Medicare's benefit is not limited in terms of time. Hospice care is available as long as the patient's prognosis meets the law's six-month test. This test is a general one. As the governing statute says: "The certification of terminal illness of an individual who elects hospice shall be based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness." CMS recognizes that making medical prognostication of life expectancy is not always an exact science. ***Thus, physicians need not be concerned. There is no risk to a physician about certifying an individual for hospice care that he or she believes to be terminally ill***.

Program Memorandum Intermediaries/Carriers, Subject: Provider Education Article, CMS-Pub. 60AB (Mar. 28, 2003) (quoting 42 U.S.C. § 1395f(a)(7)) (emphasis added).

21.    CMS has not created clinical benchmarks that must be satisfied to certify a patient as terminally ill. In 2008, CMS announced a rule specifying the information a Certifying Physician "must consider" in making an initial certification. *See* 42 C.F.R. § 418.102(b). CMS initially proposed labeling the considerations "criteria," but removed that word, explaining:

> In the proposed rule, we called [the considerations] "criteria," and we believe that this term may have been the source of commenter concern. Our intent was to ensure that medical directors carefully examine all relevant information that is gathered about the patient before making [an eligibility] determination…. ***We have removed the term "criteria" in order to remove any implication that there are specific CMS clinical benchmarks in this rule that must be met in order to certify terminal illness.***

73 Fed. Reg. 32088, 32138 (June 5, 2008) (emphasis added).

8

22.     CMS has recognized that clinical principles such as decline or stabilization, which to a lay person may seem rather straightforward, are complex and nuanced in the context of prognostication, such that neither a lack of decline nor stabilization necessarily negate a terminal prognosis:

> [B]eneficiaries in the terminal stage of their illness that originally qualify for the [Benefit] but stabilize or improve while receiving hospice care, yet have a reasonable expectation of continued decline for a life expectancy of less than 6 months, remain eligible for hospice care. The [Certifying Physician] must assess and evaluate the full clinical picture of the Medicare hospice beneficiary to make the determination whether the beneficiary still has a medical prognosis of 6 months or less, regardless of whether the beneficiary has stabilized or improved.

79 Fed. Reg. 50452, 50471 (Aug. 22, 2014); *see also* 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010) ("A patient's condition may temporarily improve with hospice care."); 74 Fed. Reg. 39384, 39399 (Aug. 6, 2009) ("We also acknowledge that at recertification, not all patients may show measurable decline."). Based on CMS guidance, a federal district court has excluded proposed expert testimony alleging that an individual must show decline to remain eligible for hospice. *See Vista Hospice Care*, No. 3:07-CV-00604-M, 2016 WL 3449833, at *15 (N.D. Tex. June 20, 2016) (citing 79 Fed. Reg. 50452, 50471 (Aug. 22, 2014)). Moreover, CMS has acknowledged that a perceived improvement or stabilization (*i.e.*, an apparent lack of decline) in symptoms may not mean that an individual's *prognosis* (on which hospice eligibility is based) has changed, and it can be difficult to distinguish a sustainable stabilization from the *impression* of stabilization that could not be maintained if the patient were discharged from hospice. *See* 70 Fed. Reg. 70532, 70540 (Nov. 22, 2005); *see also* 79 Fed. Reg. 50452, 50471 (Aug. 22, 2014).

23.     CMS contracts with Medicare Administrative Contractors ("MACs"), which are private companies that process and pay Medicare claims on behalf of CMS. There are three MACs that process hospice claims, and each issues hospice Local Coverage Determinations ("LCDs") applicable to their individual jurisdictions. Hospice LCD guidelines set forth certain clinical

information to be considered when assessing hospice eligibility, *not* mandatory clinical criteria that must be documented in the medical record to demonstrate terminality.

24.    LCD guidelines do not and *cannot* establish or change the substantive legal standard for hospice eligibility because LCDs have not gone through the notice-and-comment process outlined at 42 U.S.C. § 1395hh. *See Agendia, Inc. v. Becerra*, 4 F.4th 896, 900 (9th Cir. 2021). Accordingly, hospice eligibility cannot be limited by LCDs if an individual otherwise satisfies the only valid and substantive legal standard applicable: a determination by a physician that the individual has a prognosis of six months or less if their illness runs its normal course. 42 U.S.C. § 1395x(dd)(3)(A); 42 C.F.R. § 418.3. In other words, LCDs represent only one of an indefinite number of ways Certifying Physicians may support their conclusion that an individual has a terminal prognosis under the statutory and regulatory standard. *Vista Hospice Care*, 2016 WL 3449833, at *4 ("Meeting…[LCD guidelines] is *one path* to eligibility under the [Benefit], but hospices may 'otherwise demonstrate…that the patient has a terminal prognosis.'"). In fact, the NGS LCD itself explicitly acknowledges that "[s]ome patients may not meet these guidelines, yet still have a life expectancy of six months or less. Coverage for these patients may be approved if documentation otherwise supporting a less than six-month life expectancy is provided." *See* NGS's LCD for Hospice - Determining Terminal Status (L33393). In other words, applicable law and guidance intentionally gives Certifying Physicians leeway to determine, using clinical judgment, whether the frequency, severity, and combination of each unique patient's symptoms and diagnoses are indicative of a terminal prognosis.

25.    The application of hospice LCDs to a particular individual's circumstances is a complex clinical analysis that requires the appropriate medical knowledge, skill, experience, and expertise. Hospice LCDs are flexible and lack the more defined thresholds and exhaustive lists of

factors present in the LCDs for other Medicare items and services. For example, the applicable NGS LCD's Part I "Decline in Clinical Status" guidelines lists "*examples* of clinical findings that generally connote a poor prognosis" but acknowledges that "[o]ther clinical variables not on th[e] list may support a six-month or less life expectancy." L33393 (emphasis added). Therefore, although the identified factors could support a terminal prognosis if present, they are *not* requirements to demonstrate hospice eligibility, nor do they comprise an exhaustive list of all clinical variables relevant to prognostication. Similarly, Parts II and III of NGS's LCD—which are to be applied in conjunction—state that use of the word "should" means the disease-specific guidelines should be considered when evaluating eligibility, but "[i]t does not mean…that meeting the guideline is required. The *only requirement* is that the documentation supports the beneficiary's prognosis of six months or less, if the illness runs its normal course." L33393 (emphasis added).

26.    LCDs do not establish substantive legal standards—*i.e.*, LCDs themselves do not conclusively establish what is reasonable and necessary. Rather, LCDs are "non-binding polic[ies]" intended to aid in physician decision-making regarding eligibility and facilitate ALJs' analysis of the individual facts presented to determine whether services provided were reasonable and necessary. *See* 70 Fed. Reg. 11419, 11458 (March 8, 2005); 42 U.S.C. § 1395y(a)(1)(A).[1] Accordingly, although ALJs must give "substantial deference to [LCDs] if they are applicable to a particular case," ALJs are "not bound by LCDs[.]" 42 C.F.R. § 405.1062(a). If LCDs were rigid, all-or-nothing checklists for eligibility (*i.e.*, if they were to be afforded *complete* deference, rather than just substantial deference), they would (a) need to go through the § 1395hh notice-and-comment process and (b) interfere with physicians' exercise of clinical judgment. CMS was clear

---

[1] "Reasonable and necessary" is the ultimate standard ALJs are bound by under the Social Security Act for Medicare reimbursement. In the context of hospice, a determination of "reasonable and necessary" is inextricably intertwined with a clinical determination of terminality. 42 U.S.C. § 1395y(a)(1)(C) (care must be "reasonable and necessary for the palliation or management of terminal illness.").

in the promulgation of the final rule passing the "substantial deference" regulatory standard that the standard "does not alter the ALJ's role as an independent fact finder," and that the regulation should not "lead to adjudicators 'rubber stamping' the previous appeal decision." *See* 74 Fed. Reg. 65296, 65327 (Dec. 9, 2009) (referencing 70 Fed. Reg. 11419, 11458 (March 8, 2005)). While ALJs may weigh the evidence in the administrative record (including any testimony provided), they *may not* make independent medical findings based on their own interpretation of the medical records. *See, e.g.*, *Hospice of E. Tex.*, 2025 WL 1062504, at * 27.

27.     Based on CMS commentary, if an individual meets LCD guidelines, then the ALJ must, in substantial deference to the LCD, determine that the individual is eligible for hospice. *See* 82 Fed. Reg. 4974, 5026 (stating that claims may be "denied in error as a result of [a reviewer's] non-compliance with…authority that is owed substantial deference, such as LCDs."). However, if an individual does not meet LCD guidelines, it does not necessarily follow that the individual is ineligible for hospice. The "substantial deference" standard requires ALJs to utilize LCDs as a basis to *allow* for reimbursement when the guidelines are met but *does not* permit ALJs to deny reimbursement solely because an individual does not squarely fall within the LCD. If, after undertaking an analysis as an independent factfinder, the ALJ determines that an individual's condition does not satisfy LCD guidelines, the ALJ must consider all other relevant factors bearing on prognosis, including those beyond the confines of the LCD, in order to render a decision.

28.     In cases where CMS or its contractors determine that an item or service is not reasonable and necessary, Section 1879 of the Social Security Act (the "Act"), codified at 42 U.S.C. § 1395pp, provides that payment shall nevertheless be made for such items or services if the provider did not know, and could not reasonably have been expected to know, that such items or services would not be covered. This limitation of liability provision specifically applies to cases

where CMS or its contractors determine that a Medicare hospice beneficiary was not terminally ill. 42 U.S.C. § 1395pp(g)(2); *see also* Medicare Financial Management Manual ("MFMM"), CMS Pub. 100-06, Ch. 3 § 70.1.

29.     If CMS determines a provider has been overpaid, Section 1870 of the Act, codified at 42 U.S.C. § 1395gg, allows for waiver of recoupment of the overpayment where the provider is deemed to be "without fault" in creating the overpayment. A provider is "without fault" as to the creation of an overpayment, and thus entitled to waiver of recoupment of the overpayment, where it had a reasonable basis for assuming that the payments received were correct. 42 U.S.C. § 1395gg; *see also* MFMM, CMS Pub. 100-06, Ch. 3 § 90.

**The Medicare Claims Submission, Payment, Auditing, and Appeal Processes**

30.     The Medicare program is administered by the Secretary through CMS which, in turn, contracts with private entities to perform certain functions on its behalf. These functions include, but are not limited to, claims processing for reimbursement submitted by Medicare providers and audits of such claims to ensure that they meet the requirements set forth in the Medicare statute and its implementing regulations.

31.     Medicare claims are processed by MACs. Other CMS divisions or contractors, such as the CMS Center for Program Integrity ("CPI"), Uniform Program Integrity Contractors ("UPICs"), and Supplemental Medical Review Contractors ("SMRCs"), are authorized by CMS to audit claims for payment that health care providers billed to Medicare for services they provided to Medicare beneficiaries. These audits are performed on a post-payment basis to ensure that the claims complied with Medicare coverage and documentation requirements at the time they were submitted for reimbursement.

32.     If a CMS division or contractor audits and denies a claim, the affected provider may avail itself of an administrative appeals process to contest the claim denial(s) and resulting overpayment. This appeals process consists of five stages: (i) redetermination, (ii) reconsideration, (iii) a hearing before an ALJ, (iv) review by the Council, and (v) judicial review by a federal district court.

33.     Requests for redetermination are processed by MACs. Requests for reconsideration are handled by separate contractors known as Qualified Independent Contractors ("QICs"). Hearing requests are adjudicated by ALJs in OMHA. Requests for review are processed by the Council, which is a component of the HHS Departmental Appeals Board.

## **FACTUAL ALLEGATIONS**

34.     On behalf of CMS, the SMRC, Noridian Healthcare Solutions, LLC ("Noridian"), requested records from the Hospice in a letter dated May 8, 2023. Specifically, Noridian requested records pertaining to 349 claims for ten (10) beneficiaries billed to Part A for services provided by the Hospice between November 1, 2019, and March 31, 2023.

35.     The records Noridian requested included, among other things, hospice election statements, the CTIs and corresponding F2F documentation covering the requested dates, visit notes from all interdisciplinary team ("IDT") members, plans of care, IDT notes, physician orders, and medication lists. The Hospice promptly complied with this request and provided Noridian with thousands of pages of responsive records for review.

36.     In a letter dated November 1, 2023, Noridian informed the Hospice that it denied 291 claims, resulting in an error rate of 75% and corresponding overpayment of $1,291,810.00.

37.     The MAC, NGS, subsequently issued demand letters dated January 9, 2024, and January 10, 2024, requesting repayments of $1,257,499.01 and $14,795.44, respectively.

38.     The Hospice initiated the Medicare administrative appeal process to dispute Noridian's findings, the overpayment, and the NGS's demands. On January 18, 2024, the Hospice filed a timely request for redetermination with NGS, seeking review of 264 of the denied claims for eight (8) patients worth approximately $1,286,700.00.

39.     On March 4, 2024, NGS issued a partially favorable redetermination decision that upheld the denial of 257 of the appealed claims.

40.     On April 30, 2024, the Hospice submitted reconsideration requests to Maximus Federal Services, Inc. ("Maximus"), the QIC, appealing all 257 denied claims.

41.     Maximus issued a fully unfavorable reconsideration decision dated June 28, 2024.

42.     On August 23, 2024, the Hospice filed a request for a hearing before an ALJ, seeking review of all 257 denied claims pertaining to eight (8) patients. On September 11, 2024, the Hospice received notice that the appeal would be adjudicated by ALJ Kenneth Ball. The hearing was ultimately scheduled for March 20, 2025. In its January 24, 2025, response to the Fifth Amended Notice of Hearing, the Hospice enclosed the curricula vitae of its testifying physicians. Ruth Thomson, DO, FACOI, FAAHPM, HMDC, MBA, is an independent, board-certified hospice and palliative care physician and certified hospice medical director ("Hospice Expert"), and Paden Hendrickson, MD, who was the applicable patients' certifying physician during most of the appealed dates of service ("Certifying Physician").

43.     On March 14, 2025, in advance of the ALJ hearing, the Hospice submitted a position statement to ALJ Ball. The position statement summarized certain relevant legal and medical authorities that supported the propriety of the claims at issue. The position statement also attached detailed summaries of clinical data from the medical records supporting the patients' terminal prognoses, a declaration from the Hospice Expert related to the assessment of patient

15

clinical eligibility for hospice services, and written testimony from the Certifying Physician and Sekar Annamalai, MD, his physician colleague at the Hospice (who were responsible for certifying the patients as terminally ill throughout the dates at issue), reaffirming their clinical judgment reflected in the applicable CTIs.

44.    In preparation for the ALJ hearing, the Hospice Expert applied her specialized skills and knowledge as a board-certified hospice physician to analyze the medical records the Hospice previously submitted to Noridian and the other CMS contractors. Based on her analysis, she arrived at an opinion concerning whether the medical records supported the conclusions of the two certifying physicians that each patient at issue had a "terminal illness" during the dates of service under review. The Certifying Physician also reviewed the medical records to re-assess his own prior medical determinations and those of his physician colleague.

45.    The hearing took place before ALJ Ball on March 20, 2025. The Hospice Expert and Certifying Physician appeared and provided medical opinion testimony on behalf of the Hospice. Noridian, which elected to be a party to the hearing, appeared via Drs. Anna Lee Amarnath, Scott Johnson, and Richard Whitten ("Noridian Representatives"), who identified themselves as a family physician, a surgeon, and a general internist, respectively. The Noridian Representatives are neither board certified in hospice and palliative care (like the Hospice Expert), nor were they involved in the care of the subject patients (like the Certifying Physician).

46.    At the hearing, the Hospice Expert testified that—based on her review of the medical records, and after applying her knowledge, skills, and experience as a seasoned hospice physician—the medical records supported the certifying physicians' clinical judgment reflected in the applicable CTIs and demonstrated that the patients at issue had life expectancies of six months or less if their illnesses ran their normal course during the dates of service under review. The

16

Hospice Expert further testified that the decisions issued by Noridian, NGS, and Maximus denying the claims at issue were not supported by the medical records and failed to properly apply fundamental clinical and legal hospice principles. The Certifying Physician testified that—based on his re-review of the medical records and firsthand knowledge of certain patients—that they were terminally ill and hospice eligible.

47.     Despite the robust medical opinion testimony from two experienced hospice physicians supporting the propriety of the claims at issue, ALJ Ball issued a decision dated November 18, 2025 (the "Decision") that upheld the denial of nearly every claim. Specifically, the Decision approved just six (6) of the 257 claims appealed, seemingly based solely on the recommendation of the Noridian Representatives, which left a remaining overpayment of approximately $1,223,171.00.

48.     On January 16, 2026, the Hospice submitted a Request for Review of Administrative Law Judge Medicare Decision seeking the Council's review of the Decision. In an exhibit to its submission to the Council, the Hospice provided additional details regarding, and specific examples illustrating, the errors ALJ Ball made leading up to and during the hearing and in the Decision. That exhibit is attached hereto as **Exhibit A** and incorporated herein by reference.

49.     The Council did not issue a final decision or dismissal order or remand the case to the ALJ within 90 calendar days of receipt of the Hospice's Request for Review. *See* 42 C.F.R. § 405.1100(c). Accordingly, on April 23, 2026, the Hospice properly requested that the appeal be escalated to federal district court as permitted by 42 C.F.R. § 405.1132(a). On May 1, 2026, the Council issued an order granting the Hospice's request for escalation.

50.     The Hospice has thus exhausted its administrative remedies, and this case is eligible for judicial review.

51.     This Complaint is timely filed within sixty calendar days after the Hospice received the Council's order. *See* 42 C.F.R. § 405.1132(b).

### COUNT I: VIOLATION OF THE MEDICARE ACT
### AND ADMINISTRATIVE PROCEDURE ACT
**The ALJ Applied the Incorrect Legal Standards.**

52.     The Hospice hereby incorporates by reference paragraphs 1 through 51 herein.

53.     Under the APA, a court reviewing agency action must set aside agency findings that are "not in accordance with law." 5 U.S.C. 706(2)(A). When reviewing agency action, courts must use their own independent judgment to decide questions of law, with no deference to the agency. *See Loper Bright Enterprises v. Raimondo*, No. 22-1219, 2024 WL 3208360, at *12 (U.S. June 28, 2024) (citing 5 U.S.C. § 706).

54.     The failure to apply the correct legal standards or to provide the Court with sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.

55.     The ALJ applied incorrect legal standards including, but not limited to, those described in Exhibit A, and specifically when he: (a) misapplied the legal standards governing hospice eligibility at 42 U.S.C. § 1395x(dd)(3)(A); (b) failed to determine that hospice services provided to the patients at issue during the denied periods were reasonable and necessary as defined at 42 U.S.C. § 1395y(a)(1)(C); (c) entirely disregarded the role of physician medical judgment in certifying patients as terminally ill as set forth at 42 U.S.C. §1395f(a)(7); and (d) failed to demonstrate any consideration for or application of the LCD guidelines owed substantial deference when evaluating the record. Further, the ALJ improperly upheld meritless technical denials for one patient based on his own documentation preferences, which exceed applicable legal requirements.

56. Based on this failure to apply the correct legal standards, the Decision should be reversed.

**COUNT II: VIOLATION OF THE MEDICARE ACT**
**AND ADMINISTRATIVE PROCEDURE ACT**
**The ALJ's Decision is Not Supported by Substantial Evidence.**

57. The Hospice hereby incorporates by reference paragraphs 1 through 51 herein.

58. The ALJ's Decision must be supported by "substantial evidence," and where reliance is placed on one portion of the record in disregard of over-balancing evidence to the contrary, the court may reverse the Decision.

59. The unfavorable determinations in the ALJ's Decision are not supported by substantial evidence and were contrary to the overwhelming weight of the evidence, as explained in Exhibit A. The medical records and the medical opinion testimony of the Hospice Expert and Certifying Physician show, by a preponderance of the evidence, that the patients had terminal prognoses of six months or less if their illnesses ran the normal course during the dates at issue.

60. Without a rational basis or explanation, the ALJ disregarded the opinions of the two experienced hospice physicians who testified at the hearing and instead repeatedly agreed with the testimony of the Noridian Representatives, despite their lack of hospice training and experience.

61. The ALJ failed to give appropriate weight and deference to the certifying physicians' clinical judgment, despite acknowledgment by Congress and CMS that a hospice physician's role is central to the Benefit.

62. The ALJ improperly made clinical inferences and reached medical conclusions regarding the patients' prognoses without the training or experience necessary to engage in prognostication, the aid of medical opinion testimony from a qualified expert, or providing sufficient explanation or evidentiary support for those conclusions.

63.     The ALJ improperly confined his review of the medical records to the CTI's alone, to the exclusion of other documents supporting the patients' terminal prognoses and the reasonableness of the certifying physicians' conclusions within those CTIs.

64.     As a result of the absence of substantial evidence supporting the Decision, the Decision should be reversed.

## COUNT III: VIOLATION OF THE SOCIAL SECURITY ACT
**The ALJ Failed to Limit the Hospice's Liability as Required by Section 1879(a) and (g)(2).**

65.     The Hospice hereby incorporates by reference paragraphs 1 through 51 herein.

66.     Section 1879(a) and (g)(2) of the Act limit the Hospice's liability for any alleged overpayment.

67.     Section 1879 provides financial relief to beneficiaries, providers, practitioners, and other suppliers who acted in good faith in accepting or providing services found to be not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* MFMM, CMS Pub. 100-06, Ch. 3 § 70.1.

68.     The protection afforded under Section 1879 was expanded in 1997 specifically to guard *hospice* beneficiaries and providers from liability arising from "incorrect" diagnoses of terminal illness in cases where the beneficiary and/or provider "did not know and could not reasonably have been expected to know" that the diagnoses were incorrect. *See* 42 U.S.C. §§ 1395pp(a) and (g)(2); *see also* Cong. Rec. E1084 (June 3, 1997).

69.     The ALJ's Decision fails to properly interpret and apply the limitation of liability provision of Section 1879(a) and (g)(2) in that the ALJ concluded that the Hospice "could have been expected to have known" that the services it provided to the patients at issue would not be covered by Medicare (*i.e.*, that the patients were not terminally ill) simply based on "receipt" of CMS and contractor guidance. The ALJ did not explain how knowledge or receipt of general

guidance equates to knowledge that the *specific* patients at issue were not terminally ill—a determination that requires the clinical judgment of a physician..

70.     Therefore, the ALJ's Decision should be reversed, and this Court should rule that the Hospice is entitled to the limitation of liability for the full value of the denied claims.

### COUNT IV: VIOLATION OF THE SOCIAL SECURITY ACT
### The ALJ Failed to Waive the Alleged Overpayment as Required by Section 1870.

71.     The Hospice hereby incorporates by reference paragraphs 1 through 51 herein.

72.     Section 1870 of the Act waives the Hospice's liability for the overpayment.

73.     Under Section 1870, a provider is "without fault" if it "exercised reasonable care in billing for, and accepting, the payment" (*i.e.*, it had a reasonable basis for assuming that the payment was correct). *See* MFMM, CMS Pub. 100-06, Ch. 3 § 90.

74.     The ALJ's Decision did not provide any analysis of Section 1870, yet concluded that "recovery of the overpayment from the provider is not waived." The Decision does not explain how the Hospice was unreasonable in assuming that the services were reasonable and necessary and the payments correct

75.     As a matter of law and fact, the Hospice is "without fault," and its liability for the overpayment must be waived.

### REQUEST FOR RELIEF

**WHEREFORE**, the Hospice respectfully requests that this Court:

76.     Find the Decision applied the wrong legal standards;

77.     Find the Decision was not supported by substantial evidence;

78.     Reverse the ALJ's determination that the denied claims did not meet Medicare coverage guidelines for hospice services;

79.     Reverse the ALJ's determination that payment for the denied services cannot be made in accordance with section 1879 of the Act;

80.     Reverse the ALJ's determination that liability of the alleged overpayment cannot be waived in accordance with section 1870 of the Act;

81.     Hold that the Hospice is entitled to reimbursement for the Medicare claims that form the basis of this Complaint;

82.     Order that the Secretary reimburse (or, alternatively, remand this matter to the Secretary with directions to reimburse) the Hospice for the amounts previously recouped in relation to the Medicare claims that form the basis of this Complaint;

83.     In addition to the reimbursement described in paragraph 82, direct the Secretary to pay the Hospice applicable interest, including, but not limited to, interest required by 42 C.F.R. § 405.378(j) and the MFMM, Ch. 3, §§ 200.6 and 200.6.4, and Ch. 4, § 30.2; and

84.     Grant the Hospice any other legal or equitable relief that the Court may deem just and proper.

Date: June 30, 2026                                Respectfully submitted,

                                                   By: */s/ Alex E. Brakefield*

                                                   Alex E. Brakefield
                                                   HUSCH BLACKWELL LLP
                                                   1900 N. Pearl Street, Suite 1800
                                                   Dallas, TX 75201
                                                   Phone: 214.999.6158
                                                   Fax: 214.999.6170
                                                   Alex.Brakefield@huschblackwell.com
                                                   TX Bar No.: 24105523

                                                   ***Attorney for Infinity Hospice Care LLC***